ROBERT J. HUMPHREYS, Judge.
Otis Scott, III (“Scott”) appeals his convictions of abduction with intent to extort money, two counts of armed common law burglary, seven counts of robbery, nine counts of use of a firearm in the commission of a felony, attempted extortion, *405 and statutory burglary, in violation of Code §§ 18.2-48, 18.2-90, 18.2-58, 18.2-53.1, 18.2-59, and 18.2-90, respectively. Scott contends the trial court erred in granting the Commonwealth’s pretrial motion for joinder.[1] Specifically, Scott argues that the Commonwealth failed to prove that the offenses were part of a “common scheme or plan” and, even if they were, that “justice still required separate trials.” For the following reasons, we affirm the judgment of the trial court.
BACKGROUND
“On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.” Martin v. Commonwealth, 4 Va.App. 438, 443, 358 S.E.2d 415, 418 (1987). So viewed, the evidence established the following.
On February 3, 2003, at approximately 10:30 p.m., a man approached Michelle Bingaman (“Bingaman”) from behind as she was getting out of her car in front of her apartment building. The man pointed a gun at Bingaman’s head and stated, “[w]e can do this the easy way or the hard way.” The man told Bingaman to empty her pockets, and to lay down facing the ground. He then took her purse and fled on foot. Bingaman described the man as African-American, approximately six feet tall, medium build, and in his mid-twenties to thirties. During a photo lineup, and at trial, Bingaman positively identified Scott as the perpetrator of the crime.
On March 16, 2003, at approximately 10:40 p.m., a man approached Florentina Lizan (“Lizan”) from behind as she was getting out of her car in front of her house. The man pointed a gun at her head, demanded money and credit cards, and threatened to kill Lizan if she did not cooperate. Lizan gave the man her wallet and her credit cards. After demanding the PIN number for her card, the man fled on foot to a car parked across the street. Lizan described the man as African- *406 American, approximately five feet, nine inches tall, medium build, and in his mid-twenties or thirties. At a photo lineup, and at trial, she positively identified Scott as the perpetrator of the crime.
On March 23, 2003, shortly after 10:00 p.m., a man approached Kay Holloway (“Holloway”) from behind as she was unloading her car in front of her house. The man had a gun on his side, and he demanded money, credit cards, and Holloway’s ATM number. When Holloway did not move fast enough, the man raised the gun to his chest and pointed it at Holloway. Once Holloway gave him her money, the man fled on foot. Moments later, Holloway heard a car start up. Holloway identified the man as African-American, approximately five feet, nine inches tall, medium build, and in his mid-twenties or thirties. However, she could not identify Scott at either a photo lineup, or at trial, as the perpetrator of the crime.
On April 27, 2003, between 10:00 and 10:30 p.m., a man approached Jeffrey Ratliff (“Ratliff”) from behind as he was vacuuming out a van in front of a friend’s home. The man placed a gun on the back of Ratliffs head, and he demanded Ratliffs wallet and the “code” for his credit cards. Ratliff gave the man his wallet, but told the man that he did not have any “codes” for his cards. The man then fled on foot. Ratliff identified the perpetrator as African-American, approximately five feet ten to five feet eleven inches tall, and about 180 pounds. He could not identify the perpetrator in a photo lineup. However, on the day of the trial, Ratliff identified Scott as his assailant.
On May 2, 2003, at 8:30 p.m., a man approached Holly Narducci (“Narducci”) while she was alone in her garage. The man came up behind her from the driveway, pointed a gun at her, and said, “[s]cream and I’ll kill you.” The man demanded her wallet, stating that he wanted money and credit cards. He then asked for Narducci's PIN number, which she told him she did not have. Narducci then grabbed for the gun, a brief struggle ensued, and the man fled on foot. *407 Narducci identified Scott as the perpetrator at both a photo lineup and at trial.
On May 13, 2003, at approximately 11:00 p.m., a man approached Jean Becker (“Becker”) as she was getting out of her car in her driveway. When the man came up beside her car, Becker attempted to cross over to the other side of the vehicle in order to get away from him. However, the man grabbed her wrist and struggled with Becker in an attempt to get her wallet. In the course of the struggle, the man hit Becker with a hard object, chipping her tooth. The man took the wallet and fled. At trial, Becker identified Scott as the perpetrator of the crime.
On May 15, 2003, at approximately 12:30 a.m., a man approached Aderonke Aderonmu (“Aderonmu”) as she was getting out of her car in front of her home. The man pointed a gun at Aderonmu’s head, and he demanded all of her money or else he would “blow her head off.” Aderonmu panicked and dropped her purse. The man grabbed the purse, and he left in a car that was parked in front of a neighboring house. Aderonmu described the man as African-American with a medium build. She positively identified Scott in a photo lineup, and at trial, as her assailant.
On May 31, 2003, at approximately 9:30 p.m., a man approached Samuel Owens (“Owens”) as he was working alone in his garage. The man ran up Owens’ driveway, came into the garage, and pulled out a gun. When Owens began screaming, the assailant pointed the gun at Owens and told him to be quiet. The man demanded Owens’ wallet. When Owens told him that his wallet was in the house, the assailant forced him to retrieve it at gunpoint. After demanding Owens’ PIN number, the gunman fled on foot. Owens described the man as African-American, approximately five feet, seven inches tall, muscular, and in his mid-twenties. Owens identified Scott at both a photo lineup, and at trial, as the perpetrator of the crime.
On June 7, 2003, at around 10:00 p.m., a man approached Ian Goodwin (“Goodwin”) as he was getting into his car in *408 front of a friend’s house. The man was holding a gun, and he demanded the keys to Goodwin’s car. Goodwin said “no,” and he began yelling for help. The man hit Goodwin several times in the head, and he then fled on foot. After the attack, Goodwin realized that his wallet was missing. Goodwin described his attacker as African-American, in his thirties, under six feet tall, and well built. Goodwin could not identify his attacker in a photo lineup, but at trial, Goodwin stated that Scott “positively resemble[d] the figure” he saw on the night he was attacked.
On June 14, 2003, a police officer stopped Scott for a traffic violation, and he was arrested for driving on a suspended license. After he was arrested, the police found a credit card belonging to Goodwin in Scott’s possession. They also found, in his car, clothing matching the descriptions given by Lizan and Narducci.
On September 2, 2003, a grand jury issued a twenty-seven-count indictment against Scott. On December 18, 2003, the Commonwealth moved for joinder, arguing that the multiple armed robberies had the following common scheme:
1. They occurred in the late evening;
2. Each of the victims were alone;
3. Each of the victims were threatened with a handgun;
4. The suspect demanded personal property from each victim;
5. The victims had either just arrived in their vehicle or were in their garage;
6. All of the robberies occurred in a residential neighborhood;
7. Most of the victims were either threatened or suffered bodily injury at the hands of the suspect;
8. Each robbery was committed by a lone suspect.
On January 14, 2004, after oral argument, the trial court granted the Commonwealth’s motion for joinder. The trial court held that,
*409 [i]n weighing all of the various factors that we have considered ... and in balancing all of the prejudice or the possible prejudice to the defendant and the other factors we’ve talked about, including the fact that several lay witnesses perhaps ostensibly might be required to testify in multiple separate trials if they were to be held separately, the standard by which that evidence is judged, the likelihood that at least some of those individuals may be in a position to be permitted to offer testimony as to identity in those cases in which identity would be an issue, the substantial similarities in terms of the modus operandi in these offenses, the method by which they were carried out, the similarity in the selection of victims, the type of victim, the location that was selected for the offenses, the offense itself that was committed, what was taken, what was requested in addition to the method and means by which the crimes were carried out, I think all of that suggest that the Commonwealth’s motion should be granted____ I do not find that justice requires separate trials in this case.
On December 16, 2004, a jury convicted Scott of abduction with intent to extort money, two counts of armed common law burglary, seven counts of robbery, nine counts of use of a firearm in the commission of a felony, one count of attempted extortion, and one count of statutory burglary, in violation of Code §§ 18.2-48, 18.2-90, 18.2-58, 18.2-53.1, 18.2-59, and 18.2-90.[2] On January 21, 2005, the trial court affirmed the findings of the jury, and sentenced Scott to 253 years incarceration. Scott now appeals.
ANALYSIS
“Rule 3A:10(e) permits the trial of multiple offenses committed by one defendant ‘if justice does not require separate trials and ... the offenses meet the requirements of Rule 3A:6(b).’ ” Traish v. Commonwealth, 36 Va.App. 114, 129, 549 S.E.2d 5, 12 (2001) (quoting Rule 3A:10(c)). Rule 3A:6(b), in turn, “permits the joinder of offenses ‘if the offenses are based *410 on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan.’ ” Id. The determination of whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court, Yellardy v. Commonwealth, 38 Va.App. 19, 23-26, 561 S.E.2d 739, 742 (2002), and a trial court’s ruling on the matter will not be reversed absent a showing that the court abused its discretion, Ferrell v. Commonwealth, 11 Va.App. 380, 386, 399 S.E.2d 614, 617 (1990).
A. Whether the Offenses Were Connected or Constituted Parts of a Common Scheme or Plan
Rule 3A:6(b) provides three alternative ways to join multiple offenses into one trial. Specifically, “[o]ffenses may be joined if (1) the offenses are based on ‘the same act or transaction,’ (2) the offenses are based on ‘two or more acts or transactions that are connected,’ or (3) the offenses ‘constitute parts of a common scheme or plan.’ ” Cook v. Commonwealth, 7 Va.App. 225, 228, 372 S.E.2d 780, 782 (1988) (quoting Rule 3A:6(b)). Here, the offenses were not “based on the same act or transaction.” See Brown v. Commonwealth, 37 Va.App. 507, 514, 559 S.E.2d 415, 418 (2002) (noting that the alleged offenses “were not part of the ‘same act or transaction’ ” because “[e]ach offense was a separate act taking place at a different location and at a different time”); see also Purvis v. Commonwealth, 31 Va.App. 298, 305, 522 S.E.2d 898, 901 (2000) (same). Accordingly, the controlling inquiry is whether the alleged offenses are “connected” or “constitute parts of a common scheme or plan.” See Rule 3A:6(b) (emphasis added).
To determine whether the offenses were based on two or more acts or transactions that are “connected,” the “crimes should be ‘so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety.’” Spence v. Commonwealth, 12 Va.App. 1040, 1044, 407 S.E.2d 916, 918 (1991) (quoting Kirkpatrick v. Commonwealth, 211 Va. 269, 273, 176 S.E.2d 802, 806 (1970)). In determining whether separate crimes are *411 “connected” within the meaning of Rule 3A:6(b), the trial court should therefore consider whether the acts “were closely-connected in time, place, and means of commission,” Satcher v. Commonwealth, 244 Va. 220, 229, 421 S.E.2d 821, 827 (1992), as well as whether any evidence “link[s] or connect[s] one [offense] with the other,” Spence, 12 Va.App. at 1044, 407 S.E.2d at 918.
A “common plan,” in contrast, exists when the “ ‘relationship among offenses ... is dependent upon the existence of a plan that ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not attainable by the commission of any of the individual offenses.’ ” Godwin v. Commonwealth, 6 Va.App. 118, 122, 367 S.E.2d 520, 522 (1988) (quoting 2 ABA Standards for Criminal Justice § 13-1.2., at 13.9 (Supp. 1986) (commentary following § 13.1.2.) (omission in original)). In determining whether a common plan exists, the trial court should consider the “relationship among offenses,” id., focusing upon whether the crimes, collectively, are motivated by a desire to attain a particular and identifiable goal. See id. (“A conspiracy involving more than one offense is a typical example of offenses involving a common plan.”); see also Webster’s Third New International Dictionary 1729 (1993) (defining “plan” as “a proposed undertaking or goal”).
On the other hand, separate offenses may be deemed part of a common scheme if their commonality of features, taken together, gives rise to a reasonable inference that each individual offense is attributable to the existence of an “artful plot”—for example, to repeatedly commit a particular type of crime. See Black’s Law Dictionary 1346 (7th ed. 1999) (defining “scheme” as “[a]n artful plot,” usually “to deceive others,” such as “a scheme to defraud creditors”); id. at 269 (defining “common design,” a designated synonym of “common scheme,” as “[a]n intention to commit more than one crime”); see also Scates v. Commonwealth, 262 Va. 757, 762, 553 S.E.2d 756, 759 (2001) (holding that evidence of similar acts is admissible as proof of a common scheme “ ‘where there is such a *412 concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations’ ” (quoting McWhorter v. Commonwealth, 191 Va. 857, 870-71, 63 S.E.2d 20, 26 (1951)) (internal quotations omitted)). In determining whether two or more offenses are sufficiently related to constitute parts of a common scheme, the trial court should consider the common features between the offenses, such as whether the crimes have common types of victims, a common purpose, or a similar modus operandi. See, e.g., Traish, 36 Va.App. at 129-30, 549 S.E.2d at 12 (holding that the defendant’s commission of several virtually identical crimes sufficed to prove a “common scheme” to “systematically bilk women drivers”); Kirk v. Commonwealth, 21 Va.App. 291, 296, 464 S.E.2d 162, 164 (1995) (finding that various robberies were part of a “common scheme” where the defendant “approached the same store, on foot, at the same time of night, and from the same direction,” and “used the same handgun, made similar demands for money, and threatened the clerk not to follow upon exiting the store”); see also 18 U.S.C. Appx. § 1B1.3, cmt. 9A (noting that two or more offenses may be tried together under the federal system if they are “substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi”).[3]
*413 In this case, the trial court never made an explicit finding as to which alternative in Rule 3A:6(b) led to the decision to grant the motion for joinder. Instead, the trial court made several findings of fact supporting the decision. Specifically, the court found that there were “substantial similarities in terms of the modus operandi,” as well as in “the method by which they were carried out.” It also found “similarit[ies] in the selection of victims, the type of victim, [and] the location that was selected for the offenses.” Moreover, it found similarities in “the offense itself that was committed, what was taken, [and] what was requested.” The Commonwealth contends that the “reasonable inferences” drawn from this evidence clearly support a finding that the crimes were related by virtue of a common scheme. We agree.
Scott chose to attack all nine of his victims during the late evening when they were alone by a vehicle or inside a garage. Scott used a handgun[4] each time he approached a victim, and each time he threatened violence or actually struck the victim. In every instance, Scott demanded money and credits cards, and, in some cases, PIN numbers. In each instance, there was a lone victim and a single attacker. And, all of the attacks took place in residential areas located in the City of Virginia Beach.
Thus, although the crimes spanned a period of five months, the crimes were “closely connected in ... place[ ] and means of commission.” Satcher, 244 Va. at 229, 421 S.E.2d at 827; see also Yellardy, 38 Va.App. at 25, 561 S.E.2d at 742. As noted by the trial court, in addition to similar modus operandi, each crime also had a similar type of victim and occurred in a *414 similar location. It follows that the trial court, considering this evidence, could have reasonably concluded that Scott formulated a general scheme to approach unprotected residents of Virginia Beach, while those individuals were standing just outside of their homes late at night, with a handgun and under threat of violence, and with the common purpose of obtaining the victims’ credit cards, money, and PIN numbers. Cf. Ferrell, 11 Va.App. at 391, 399 S.E.2d at 620 (holding that the defendant’s “similar and continuing acts” of breaking and entering into various automobile dealerships, all located in the City of Chesapeake, constituted a common scheme or plan even though the crimes occurred over a span of approximately six weeks). Because the trial court could reasonably have concluded that the common features of the separate crimes sufficed to prove that they were the individual manifestations of some overriding criminal scheme, we hold that the trial court did not abuse its discretion in concluding that the crimes, by virtue of their striking factual similarities, satisfied the requirements of Rule 3A:6(b). See Satcher, 244 Va. at 230-21, 421 S.E.2d at 827-28; Yellardy, 38 Va.App. at 25-26, 561 S.E.2d at 742-43; Traish, 36 Va.App. at 129-30, 549 S.E.2d at 12; Kirk, 21 Va.App. at 296, 464 S.E.2d at 164.
B. Whether Justice Required Separate Trials
Although the offenses were “part of a common scheme or plan” under Rule 3A:6(b), we must also determine if justice required Scott to have separate trials. See Rule 3A:10(c). Scott objected to the motion for joinder, arguing that there will be obvious prejudice to him by joining, into one trial, victims who can identify Scott as the attacker, with those who cannot.[5] We disagree.
*415 Justice typically “requires separate trials where the evidence of one of the crimes is not admissible in the trial of the other.” Godwin, 6 Va.App. at 123, 367 S.E.2d at 522. Thus, when determining whether justice permits separate offenses to be tried simultaneously, the primary inquiry is whether evidence of the other criminal conduct would be admissible, during the trial of each individual offense, under one of the exceptions to the rule prohibiting the introduction of “other crimes” evidence. See generally Kirkpatrick, 211 Va. at 272, 176 S.E.2d at 805.
As pertinent here, evidence of “other crimes” is relevant and admissible to prove “the perpetrator’s identity,” as long as “ ‘some aspects of the [other criminal conduct] are so distinctive or idiosyncratic that the fact finder reasonably could infer that the same person committed both crimes.’ ” Shifflett v. Commonwealth, 29 Va.App. 521, 529, 513 S.E.2d 440, 444 (1999) (quoting Guill v. Commonwealth, 255 Va. 134, 138-39, 495 S.E.2d 489, 491 (1998)). Thus, justice does not generally require separate trials when evidence of the other offenses would be admissible, in each individual trial, to prove the perpetrator’s identity. Traish, 36 Va.App. at 130, 549 S.E.2d at 13; see also Commonwealth v. Minor, 267 Va. 166, 174, 591 S.E.2d 61, 66-67 (2004); Turner v. Commonwealth, 259 Va. 645, 651, 529 S.E.2d 787, 791 (2000) (“Proof of modus operandi is competent evidence where there is a disputed issue of identity.”).
In this case, the trial court specifically found that, “for all of the reasons we’ve talked about ... [and] in weighing all of the competing interests in this type of circumstance, [] justice suggests it is appropriate to try these cases together.” The trial court reasoned that,
in balancing all of the ... possible prejudice to the defendant, including the fact that several lay witnesses perhaps ostensibly might be required to testify in multiple separate trials if they were to be held separately, the standard by which that evidence is judged, and the likelihood that at least some of those individuals may be in a position to be *416 permitted to offer testimony as to identity in those cases in which identity would be an issue,
joining the cases together would not prejudice Scott. We agree.
Because the crimes were strikingly similar, evidence from one crime would be highly relevant in the trial of another in order to establish the identity of the perpetrator. See Shifflett, 29 Va.App. at 529, 513 S.E.2d at 444. Specifically, as discussed above, each crime was committed during the late evening, each victim was alone outside of his or her Virginia Beach residence, each perpetrator used a handgun, each perpetrator threatened violence or actually struck the victim, each perpetrator demanded money and credit cards from the victim, each perpetrator fled on foot, and, during most of the crimes, the perpetrator also requested a PIN number. Considering these factual similarities, “proof of the identical methods used to commit the [] robberies tends to prove the identity of appellant as the person who committed [each] offense[ ].” Yellardy, 38 Va.App. at 25, 561 S.E.2d at 742; see also Ferrell, 11 Va.App. at 389-90, 399 S.E.2d at 619 (upholding joinder of offenses for trial under Rule 3A:6(b) and noting that the charged offenses “need not bear ... an exact resemblance” to one another, but must instead “bear a singular strong resemblance ..., thus tending to establish the probability of a common perpetrator” (internal quotations omitted)).
Although relevant to prove identity, however, we must also consider whether the probative value of the other offenses would be outweighed by the potential for unfair prejudice. See Guill, 255 Va. at 139, 495 S.E.2d at 491-92 (“Admission of [other crimes] evidence ... is subject to the further requirement that the legitimate probative value of the evidence must exceed the incidental prejudice caused the defendant.”); Lewis v. Commonwealth, 225 Va. 497, 502, 303 S.E.2d 890, 893 (1983) (“Whenever the legitimate probative value outweighs the incidental prejudice to the accused, evidence of prior offenses, if otherwise competent, is admissible.”). If so, justice would likely require separate trials because the evidence, although factually relevant, would be inadmissible during the individual *417 trials of the separate offenses. See Long v. Commonwealth, 20 Va.App. 223, 226, 456 S.E.2d 138, 139 (1995) (“Justice often requires separate trials where highly prejudicial evidence of one of the crimes is not admissible in the trial of the other.”).
In each of the instant cases, “[a]t trial, the identity of the perpetrator was the primary issue in dispute.” Traish, 36 Va.App. at 130, 549 S.E.2d at 13. Because, under these circumstances, “the probative value of the evidence of the other offenses is obvious, we cannot say that [the] trial court abuse[d] its discretion by finding that the probative value outweigh[s] the prejudicial effect of such evidence.” Id. at 131, 549 S.E.2d at 13; see also Brown, 37 Va.App. at 516, 559 S.E.2d at 420. Because proof of the other crimes would therefore be admissible during each individual trial as proof of the perpetrator’s identity, it follows that the trial court did not abuse its discretion in determining that justice permitted these offenses to be tried simultaneously. See Traish, 36 Va.App. at 131, 549 S.E.2d at 13; see also Yellardy, 38 Va.App. at 26, 561 S.E.2d at 743 (“Because proof of the two offenses was relevant to prove ... identity, ... justice did not require separate trials.”). And, because justice did not require separate trials, the separate offenses met the requirements of Rule 3A:10(c) and, thus, could be tried together in a single proceeding.
CONCLUSION
Because of the strikingly similar characteristics of the nine robberies, a fact finder could reasonably infer that they constituted parts of a common scheme, as required by Rule 3A:6(b). And, because evidence of the other crimes would have been admissible in each of the individual trials to establish the identity of the perpetrator, the trial court did not abuse its discretion in concluding that justice allowed the offenses to be tried together. Because the requirements of Rule 3A:10(c) were therefore fulfilled, it follows that the trial court did not abuse its discretion by granting the Commonwealth’s motion for joinder. Thus, we affirm Scott’s convictions.

Affirmed.

. Judge Stephen C. Mahan granted the Commonwealth's motion for joinder on January 14, 2004.

. Apparently, this case was being re-tried following an earlier mistrial.

. To establish a “common scheme or plan,” then, it is not always necessary to show that the defendant was motivated by a goal “not attainable by the commission of any of these individual offenses.” Godwin, 6 Va.App. at 122, 367 S.E.2d at 522. Although Godwin has been subsequently cited as defining a "common plan or scheme,” we note that the language of the opinion itself was limited to defining a “commonplan." See id. In that sense, Godwin is distinguishable from Traish and Kirk, both of which focused, instead, upon whether the evidence sufficed to prove a common scheme. See Traish, 36 Va.App. at 129-30, 549 S.E.2d at 12; Kirk, 21 Va.App. at 296, 464 S.E.2d at 164. Thus, because the language of Rule 3A:6(b) is phrased disjunctively (“common scheme or plan”), these cases may be reconciled on the ground that Traish and Kirk dealt with the former, and Godwin, the latter. See generally Lewis v. Commonwealth, 267 Va. 302, 314-15, 593 S.E.2d 220, 227 (2004) (" '[T]he use of the disjunctive word "or,” rather than the conjunctive "and,” signifies the availability of alternative choices.’ " (quoting Hedrick v. Commonwealth, 257 Va. 328, 339-40, *413 513 S.E.2d 634, 640 (1999) (internal quotations omitted))). And, because we find these cases to be reconcilable, we need not elect between the separate lines of precedent.

. Scott points out that the testimony regarding the type of gun used in each attack differs. Specifically, some victims testified that the gun was silver, while others testified that it was black. For purposes of determining whether there were enough similarities in the multiple crimes to support the trial judge’s decision to join the cases, we see these distinctions as immaterial.

. On brief, the Commonwealth concedes that Scott made this argument at the motion hearing. However, the Commonwealth argues that, because Scott did not make this argument again at trial, Rule 5A:18 bars its consideration on appeal. To the contrary, because the trial court's ruling on the motion for joinder—the same motion hearing at which the argument was made—is before this Court on appeal, we hold that the argument is preserved for purposes of this appeal.